## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

**ABDULAZIZ HAMAD ALHOMEDEY,**
**A#216 049 992,**

      **Plaintiff,**

vs.

**ANN MARIE JORDAN-STARKS**, in her official capacity as Director of the St. Louis, Missouri Field Office, U.S. Citizenship and Immigration Services;

**DAVID DOUGLAS**, in his official capacity as District Director of the Kansas City District Office, U.S. Citizenship and Immigration Services;

**L. FRANCIS CISSNA**, in his official capacity as Director of U.S. Citizenship and Immigration Services;

**UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES**;

 and,

**MATTHEW G. WHITAKER**, in his official capacity as Acting Attorney General of the United States,

      **Defendants.**

**Case No.** 4:19-cv-176

## **COMPLAINT**

Plaintiff Abdulaziz Hamad Alhomedey asserts his cause of action against Defendants Ann Marie Jordan-Starks, David Douglas, L. Francis Cissna and the U.S. Citizenship & Immigration Services as follows.

1.       Plaintiff Abdulaziz Hamad Alhomedey is a citizen of Saudi Arabia.

2.       Saudi Arabia is a predominantly Muslim country.

3.       Plaintiff Abdulaziz Hamad Alhomedey currently resides in the United States.

4.       Plaintiff Abdulaziz Hamad Alhomedey is the beneficiary of an approved I-140 Petition for an Alien Worker.

5.       The I-140 Petition filed by Tri County Group XV Inc. a/k/a Pyramid Home Health, on behalf of Mr. Alhomedey was approved on December 1, 2017.

6.       As the beneficiary of an approved I-140 Petition, Mr. Alhomedey is eligible for adjustment of status under INA §245(a). Mr. Alhomedey filed his I-485 Application for Adjustment of Status on February 1, 2018.

7.       On January 11, 2019, USCIS denied the application for adjustment of status based upon its erroneous assertion that on the basis that Mr. Alhomedey was ineligible to adjust status due to his alleged unlawful presence and unauthorized work.

8.       In the denial, USCIS claims that Mr. Alhomedey worked without authorization for a total of 211 days, in excess of the 180 day maximum described under INA 245(k). In making this erroneous assertion, USCIS ignored evidence submitted by Mr. Alhomedey proving that he never worked without authorization in the United States.

9.      USCIS has made a final decision to deny adjustment of status and employment authorization to Mr. Alhomedey.

10.     The Plaintiff has no further remedies to pursue.

11.     The Plaintiff seeks judicial review under the Administrative Procedures Act of the denial of Mr. Alhomedey's applications for adjustment of status and employment authorization, and an order that those applications be approved. Mr. Alhomedey also asks the Court to declare that Defendants' decision violated the Administrative Procedure Act because it was arbitrary and capricious.

## PARTIES

12.     Defendant Ann Marie Jordan-Starks, Director of the St. Louis Field Office of the USCIS, is the highest ranking official within the St. Louis Field Office.  Jordan-Starks is responsible for the implantation of the INA and for ensuring compliance with all applicable federal laws, including the APA.  Jordan-Starks is sued in her official capacity as an agent of the government of the United States.

13.     Defendant David Douglas is the District Director of the USCIS Kansas City District Office and he is sued only in his official capacity, as well as his successors and assign. The Kansas City District Office is located at 9747 N.W. Conant Avenue, Kansas City, MO  64153. Defendant Douglas is charged with the supervision and direction of several USCIS Sub-Offices, including the Sub-Office in St. Louis, Missouri.

14.     Defendant L. Francis Cissna, Director of the USCIS, is the highest ranking official within the USCIS.  Cissna is responsible for the implementation of the INA and for ensuring

compliance with all applicable federal laws, including the APA.  Cissna is sued in his official capacity as an agent of the government of the United States.

15.     Defendant Matthew Whitaker is the Acting Attorney General of the United States who is sued only in his official capacity, as well as his successors and assigns. The Department of Justice is headquartered at 950 Pennsylvania Avenue, NW, Washington, D.C. 20530.

16.     Defendant United States Citizenship and Immigration Services (hereinafter sometimes referred to as "the USCIS") is the component of the DHS that is responsible for processing petitions filed on behalf of alien relatives seeking to file immigrant visa applications as well as motions to reconsider earlier decisions.

## JURISDICTION AND VENUE

17.     This Honorable Court has federal question jurisdiction over this cause pursuant to 28 U.S.C. § 1331, as it raises claims under the Constitution of the United States, 28 U.S.C. §1651, and the APA, 5 U.S.C. § 500 et seq..

18.     Venue is proper pursuant to 28 U.S.C. § 1391(e)(1) because (1) the Defendants are agencies of the United States or officers or employees thereof acting in their official capacity or under color of legal authority; (2) no real property is involved in this action, and; (3) Defendant USCIS maintains its District Office and the office of Defendant Moyer within this judicial district and this is the office responsible for adjudicating Plaintiff's delayed applications.

## FACTUAL BACKGROUND

19.     Mr. Alhomedey became the beneficiary of an approved H-1B filed by his employer, Pyramid Home Health, in 2014.

20.     In 2017, Pyramid Home Health filed an H-1B Renewal for Mr. Alhomedey.

21.     Several months after filing for Mr. Alhomedey's H-1B Renewal, Pyramid Home Health filed an I-140 Petition for Mr. Alhomedey.

22.     On December 2, 2017, the I-140 Petition was approved. Shortly after, on February 1, 2018, Mr. Alhomedey filed an I-485 Adjustment of Status application on the basis of his approved I-140 Petition.

23.     Mr. Alhomedey filed for Work Authorization concurrently with his I-485 application.

24.     Approximately two month later, on April 10, 2018, Mr. Alhomedey's H-1B Renewal application was denied.

25.     Upon receiving the Denial Notice of his H-1B Renewal Application on April 10, 2018, Mr. Alhomedey ceased work. Mr. Alhomedey did not begin working again until May 27, 2018, after his EAD was approved on the basis of his pending I-485 application.

26.     Mr. Alhomedey appeared for his I-485 adjustment of status interview on August 21, 2018. In support of his compliance with the INA regarding work authorization, Mr. Alhomedey submitted a letter from his employer stating that Mr. Alhomedey had not been working between the denial of his H-1B Renewal application and the date that his EAD was approved.

27.     During his interview, the USCIS Officer conducting the interview never raised any issue related to Mr. Alhomedey possibly working without authorization.

28.     The USCIS Officer who conducted Mr. Alhomedey's interview also failed to issue a Request For Evidence or a Notice of Intent to Deny, thus depriving Mr. Alhomedey of the opportunity to submit additional proof that he has ceased working or to correct the USCIS Officer's clear error.

29.     The Denial Notice fails to cite to the record and provides no evidence that Mr. Alhomedey was working between April 10, 2018 and May 27, 2018. The Denial Notice states simply "during this period of time you continued to work, therefore you worked without authorization for a total of 44 days."

## **FACTUAL BACKGROUND**

*Controlled Application Review and Resolution Program*

30.     In April 2008, USCIS created CARRP, an agency-wide policy for identifying, processing, and adjudicating immigration application that raise "national security concerns."

31.     Upon information and belief, prior to CARRP's enactment, USCIS simply delayed the adjudication of many immigration application that raised possible "national security concerns," in part due to backlogs created by the FBI Name Check.

32.     Congress did not enact CARRP, and USCIS did not promulgate it as a proposed rule with the notice-and-comment procedures mandated by the APA.  See 5 U.S.C. § 553(b)-(c).

33.     Since CARRP's inception, USCIS has not made information about CARRP available to the public, except in response to Freedom of Information Act ("FOIA") requests and litigation to compel responses to those requests. In fact, the program was unknown to the public, including applicants for immigration benefits, until it was discovered in litigation challenging an unlawful denial of naturalization and then through the government's response to a FOIA request.

34.     CARRP directs USCIS officers to screen immigration application—including application for asylum, visas, lawful permanent residency, and naturalization—for "national security concerns."

35.     If a USCIS officer determines that an application presents a "national security

6

concern," it takes the application off a "routine adjudication" track and—without notifying the applicant—places it on a CARRP adjudication track where it is subject to procedures and criteria unique to CARRP that result in lengthy delays and prohibit approvals, except in limited circumstances, regardless of an applicant's statutory eligibility.

*CARRP's Definition of a "National Security Concern"*

36.    According to the unauthorized CARRP definition utilized by Defendants, a "national security concern" arises when "an individual or organization [that] has been determined to have an articulable link"—no matter how attenuated or unsubstantiated—"to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or 237(a)(4)(A) or (B) of the Immigration and Nationality Act." Those sections of the INA make inadmissible or removable any individual who, inter alia, "has engaged in terrorist activity" or is a member of a "terrorist organization."

37.    For the reasons described herein, an individual need not be actually suspected of engaging in any unlawful activity or joining any forbidden organization to be branded a "national security concern" under CARRP.

38.    CARRP purportedly distinguishes between two types of "national security concerns": those ostensibly involving "Known or Suspected Terrorists" ("KSTs"), and those ostensibly involving "non-Known or Suspected Terrorists" ("non-KSTs").

39.    USCIS automatically considers an applicant a KST, and thus a "national security concern," if his or her name appears in the Terrorist Screening Database ("TSDB") (also referred to as the Terrorist Watch List). USCIS, therefore, applies CARRP to any applicant whose name appears in the TSDB, regardless as to whether they actually belong on the list.

40.     Upon information and belief, the TSDB includes as many as one million names, many of whom present no threat to the United States.

41.     The government's recently disclosed criteria for watchlist nominations, known as the Watchlisting Guidance, impermissible allows non-U.S. citizens, including LPRs, to be listed in the TSDB even where the government does not have "reasonable suspicion" of involvement with terrorist activity.

42.     The Guidance permits the watchlisting of non-citizens and LPRs simply for being associated with someone else who has been watchlisted, even when any involvement with that person's purportedly suspicious activity is unknown.

43.     The Guidance further provides that non-citizens and LPRs may be watchlisted based on fragmentary or uncorroborated information, or information of "suspected reliability." These extremely loose standards significantly increase the likelihood that the TSDB contains information on individuals who are neither known nor appropriately suspected terrorists.

44.     To make matters worse, the Terrorist Screening Center ("TSC"), which maintains the TSDB, has failed to ensure that innocent individuals are not watchlisted or are promptly removed from watchlists.

45.     In the year 2013, the watchlisting community added 468,749 individuals to the TSDB, and the TSC rejected only approximately one percent of those nominations.

46.     In 2009, the Government Accountability Office found that 35 percent of the nominations to the TSDB were outdated, and that tens of thousands of names had been placed on the list without an adequate factual basis.

47.     The Inspector General of the Department of Justice has criticized the Terrorist

Screening Center, which maintains the TSDB, for employing weak quality assurance mechanisms and for failing to remove subjects from the TSDB when information no longer supports their inclusion. Public reports also confirm that the government has nominated or kept people on government watchlists as a result of human error.

48.     The federal government's official policy is to refuse to confirm or deny give individuals' inclusion in the TSDB or provide a meaningful opportunity to challenge that inclusion.

49.     Nevertheless, individuals can become aware of their inclusion due to air travel experiences. In particular, individuals may learn that they are on the "Selectee List," a subset of the TSDB, if they have the code "SSSS" listed on their boarding passes. They may also learn of their inclusion in the TSDB if U.S. federal agents regularly subject them to secondary inspection when they enter the United States from abroad or when boarding a flight over U.S. airspace. Such individuals are also often unable to check in for flights online or at airline electronic kiosks at the airport.

50.     Where the KST designation does not apply, CARRP instructs officers to look for "indicators" of a "non-Known or Suspected Terrorist" ("non-KST") concern.

51.     These indicators fall into three categories: (1) statutory indicators; (2) non-statutory indicators; and (3) indicators contained in security check results.

52.     "Statutory indicators" of a "national security concern" arise when an individual generally meets the definitions described in Sections 212(a)(3)(A), (B), and (F), and 237(a)(4)(A) and (B) of the INA (codified at 8 U.S.C. § 1182(a)(3)(A), (B), and (F) and § 1227(a)(4)(A) and (B)), which list the security and terrorism grounds of inadmissibility and removability.

53.     However, CARRP expressly defines statutory indicators of a "national security concern" more broadly than the statute, stating "the facts of the case do not need to satisfy the legal

standard used in determining admissibility or removability" under those provisions of the INA to give rise to a "non-KST" "national security concern."  This is illegal and contrary to law.

54.     For example, CARRP specifically directs USCIS officers to look at evidence of charitable donations to organizations later designated as financiers of terrorism by the U.S. Treasury Department and to construe such donations as evidence of a "national security concern," even if an individual had made such donations without any knowledge or any reasonable way of knowing that the organization was allegedly engaged in proscribed activity.  Such conduct would not make an applicant inadmissible for a visa or lawful permanent resident status under the statute, see INA § 212(a)(3)(B), 8 U.S.C. § 1182(a)(3)(B), nor does it have any bearing on an adjustment application.

55.     "Non-statutory indicators" of a "national security concern" include "travel through or residence in areas of known terrorist activity"; "large scale transfer or receipt of funds"; a person's employment, training, or government affiliations; the identities of a person's family members or close associates, such as a "roommate, co-worker, employee, owner, partner, affiliate, or friend"; or simply "other suspicious activities."

56.     Finally, security check results are considered indicators of a "national security concern" in instances where, for example, the FBI Name Check—one of many security checks utilized by USCIS—produces a positive hit on an applicant's name and the applicant's name is associated with a national security related investigatory file. Upon information and belief, this indicator leads USCIS to label applicants "national security concerns" solely because their names appear in a law enforcement or intelligence file, even if they were never the subject of an investigation.

57.     Thus, an applicant's name could appear in a law enforcement file in connection with a national security investigation because he or she once gave a voluntary interview to an FBI agent, he or

10

she attended a mosque that was the subject of FBI surveillance, or he or she knew or was associated with someone under investigation.

58.     Upon information and belief, CARRP labels applicants "national security concerns" based on vague and overbroad criteria that often turn on lawful activity, national origin, and innocuous associations. These criteria are untethered from the statutory criteria that determine whether or not a person is eligible for the immigration status they seek, and are so general that they necessarily ensnare individuals who pose no threat to the security of the United States.

*Delay and Denial*

59.     Once a USCIS officer identifies a CARRP-defined "national security concern," the application is subjected to CARRP's rules and procedures that guide officers to deny such application or, if an officer cannot find a basis to deny the application, to delay adjudication as long as possible.

60.     One such procedure is called "deconfliction," which requires USCIS to coordinate with—and, upon information and belief, subordinate its authority to—the law enforcement agency, often the FBI, that possesses information giving rise to the supposed national security concern.

61.     During deconfliction, the relevant law enforcement agency has authority to instruct USCIS to ask certain questions in an interview or to issue a Request for Evidence ("RFE"); to comment on a proposed decision on the benefit; and to request that an application be denied, granted, or held in abeyance for an indefinite period of time.

62.     Upon information and belief, deconfliction not only allows law enforcement or intelligence agencies to directly affect the adjudication of a requested immigration benefit, but also results in independent interrogations of the immigration applicant—or the applicant's friends and family—by agencies such as the FBI.

63.     Upon information and belief, USCIS often makes decisions to deny immigration application because the FBI requests or recommends the denial, not because the person was statutorily ineligible for the benefit. The FBI often requests that USCIS hold or deny an application not because the applicant poses a threat, but because it seeks to use the pending immigration application to coerce the applicant to act as an informant or otherwise provide information.

64.     In addition to "deconfliction," once officers identify an applicant as a "national security concern," CARRP directs officers to perform an "eligibility assessment" to determine whether the applicant is eligible for the benefit sought.

65.     Upon information and belief, at this stage, CARRP instructs officers to look for any possible reason to deny an application so that "valuable time and resources are not unnecessarily expended" to investigate the possible "national security concern." Where no legitimate reason supports denial of an application subjected to CARRP, USCIS officers often invent false or pretextual reasons to deny the application.

66.     Upon information and belief, if, after performing the eligibility assessment, an officer cannot find a reason to deny an application, CARRP instructs officers to first "internally vet" the "national security concern" using information available in DHS systems and databases, open source information, review of the applicant's file, RFEs, and interviews or site visits.

67.     After conducting the eligibility assessment and internal vetting, USCIS officers are instructed to again conduct "deconfliction" to determine the position of any interested law enforcement agency.

68.     If the "national security concern" remains and the officer cannot find a basis to deny the benefit, the application then proceeds to "external vetting."

69.     During "external vetting," USCIS instructs officers to confirm the existence of the "national security concern" with the law enforcement or intelligence agency that possesses the information that created the concern and obtain additional information from that agency about the concern and its relevance to the individual.

70.     CARRP authorizes USCIS officers to hold application in abeyance for periods of 180 days to enable law enforcement agents and USCIS officers to investigate the "national security concern." The Field Office Director may extend the abeyance periods so long as the investigation remains open.

71.     Upon information and belief, CARRP provides no outer limit on how long USCIS may hold a case in abeyance, even though the INA requires USCIS to immigration application, including for naturalization and lawful permanent residence, within 180 days of filing the application. 8 U.S.C. § 1571(b).

72.     When USCIS considers an applicant to be a KST "national security concern," CARRP forbids USCIS field officers from granting the requested benefit even if the applicant satisfies all statutory and regulatory criteria.

73.     When USCIS considers an applicant to be a non-KST "national security concern," CARRP forbids USCIS field officers from granting the requested benefit in the absence of supervisory approval and concurrence from a senior level USCIS official.

74.     In *Hamdi v. USCIS*, 2012 WL 632397, when asked whether USCIS's decision to brand naturalization applicant Tarek Hamdi as a "national security concern" affected whether he was eligible for naturalization, a USCIS witness testified at deposition that "it doesn't make him statutorily ineligible, but because he is a—he still has a national security concern, it affects whether or not we can

approve him." The witness testified that, under CARRP, "until [the] national security concern [is] resolved, he won't get approved."

75.     Upon information and belief, USCIS often delays adjudication of application subject to CARRP when it cannot find a reason to deny the application. When an applicant files a mandamus action to compel USCIS to finally adjudicate his or her pending application, it often has the effect of forcing USCIS to deny a statutorily-eligible application because CARRP prevents agency field officers from granting an application involving a "national security concern."

76.     CARRP effectively creates two substantive regimes for immigration application processing and adjudication: one for those application subject to CARRP and one for all other application. CARRP rules and procedures create substantive eligibility criteria that exclude applicants from immigration benefits to which they are entitled by law.

77.      At no point during the CARRP process is the applicant made aware that he or she has been labeled a "national security concern," nor is the applicant ever provided with an opportunity to respond to and contest the classification.

78.     Upon information and belief, CARRP results in extraordinary processing and adjudication delays, often lasting many years, and baseless denials of statutorily-eligible immigration application.

**IRREPARABLE INJURY AND MANIFEST UNJUSTNESS**

76.     Mr. Alhomedey will suffer irreparable injury if his application for adjustment of status is not approved and his employment authorization is not reinstated and he is not allowed to live in the United States. Mr. Alhomedey's employer will also suffer irreparable harm if Plaintiff's adjustment of status is not approved.

77.     The Denial Notice informed Mr. Alhomedey that his authorization to work would be revoked within 18 days of the Denial. Without a legal basis to remain in the country, Mr. Alhomedey would be forced to leave the country. Mr. Alhomedey would be forced to leave his job and his home behind on the basis of an error by USCIS.

78.     Before issuing the denial, USCIS did not issue a Request For Evidence or a Notice of Intent to Deny. This failure is in violation of the law and deprived Mr. Alhomedey of the opportunity to hear the adverse evidence against him and offer countervailing evidence.

79.     There are no adequate review procedures that would allow Mr. Alhomedey to remain in the United States and continue working pending review of USCIS' denial. This will result in a complete disruption of Plaintiff's life and represents a miscarriage of justice.

80.     Plaintiff has already provided evidence to USCIS that refutes the single ground for Denial listed in the Denial Notice issued to Plaintiff. Plaintiff's application was denied due to USCIS error and miscalculation. If Plaintiff is forced to uproot his life and leave the country during review of the decision, he will be injured in a way that is not recompensable.

81.     It is manifestly unjust to force Mr. Alhomedey to move out of his home and leave the country and his life behind with no right to appeal the erroneous decision simply because USCIS failed to follow its own policies, and the law, and make an error in the facts. This would have the effect of punishing Mr. Alhomedey for USCIS' mistake.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

82.     Mr. Alhomedey has exhausted all his administrative remedies. There are no further administrative remedies that Plaintiff can seek.

83.     Mr. Alhomedey has no right to appeal his decision, and the option to file a Motion to Reopen or Reconsider is not an adequate form of administrative review. Further, such avenue of relief does not constitute a remedy available as of right within the meaning of 8 U.S.C. §1252(d)(1), therefore Plaintiff is not required to file a Motion to Reopen or Reconsider in order to exhaust administrative remedies.

### COUNT I - ADMINISTRATIVE PROCEDURE ACT (5 U.S.C. § 500 et seq.)

84.     Mr. Alhomedey realleges and incorporates the foregoing paragraphs as if fully set forth herein.

85.     Mr. Alhomedey has been aggrieved by agency action under the Administrative Procedure Act, 5 U.S.C. §§ 500 et seq.

86.     The documents Mr. Alhomedey submitted at the I-485 interview established that he had not been in unlawful status or worked without authorization in excess of the 180 limit established in INA § 245(k), and is thus eligible to adjust status.

87.     Defendants denied Mr. Alhomedey's I-485 application and revoked his employment authorization because they refused and/or failed to consider the evidence submitted by Mr. Alhomedey and erroneously calculated the amount of time that Mr. Alhomedey had been in unlawful status or worked without authorization.

88.     Defendants acted arbitrarily, capriciously, and contrary to law in violation of the Administrative Procedure Act by denying Mr. Alhomedey's I-485 application and revoking his work authorization.

89.     CARRP constitutes final agency action that is arbitrary and capricious because it "neither focuses on nor relates to a [non-citizen's] fitness to" obtain the immigration benefits subject

to its terms. *Judulang v. Holder*, 132 S. Ct. 476, 485 (2011).

90.     CARRP is also not in accordance with law, is contrary to constitutional rights, and is in excess of statutory authority because it violates the INA and exceeds USCIS's statutory authority to implement (not create) the immigration laws, as alleged herein.

91.     Mr. Alhomedey has exhausted all administrative remedies available to him as of right.

92.     Mr. Alhomedey has no other recourse to judicial review other than by this action.

93.     Plaintiff has suffered and continues to suffer injury in the form of unreasonable denial of his adjustment of status and being compelled to leave his job and his home and leave the country due to USCIS error.

## COUNT II - ADMINISTRATIVE PROCEDURE ACT
## (NOTICE AND COMMENT)

94.     Mr. Alhomedey realleges and incorporates the foregoing paragraphs as if fully set forth herein.

95.     The Administrative Procedures Act ("APA"), 5 U.S.C. § 553, requires administrative agencies to provide a notice-and-comment period prior to implementing a substantive rule.

96.     CARRP constitutes a substantive agency rule within the meaning of 5 U.S.C. § 551(4).

97.     Defendants failed to provide a notice-and-comment period prior to the adoption of CARRP.  Because CARRP is a substantive rule promulgated without the notice-and-comment period, it violates 5 U.S.C. § 553 and is therefore invalid.

98.     Plaintiff has suffered and continues to suffer injury in the form of unreasonable denial of his adjustment of status and being compelled to leave his job and his home and leave the country due to USCIS error.

### COUNT III - FIFTH AMENDMENT (PROCEDURAL DUE PROCESS)

99.     Mr. Alhomedey realleges and incorporates the foregoing paragraphs as if fully set forth herein.

100.     Plaintiff's compliance with the statutory and regulatory requirements established in 8 U.S.C. § 1159 and 8 C.F.R. § 335.3 (for adjustment of status applicants), vests in him a constitutionally protected property and liberty interest.

101.     This constitutionally-protected property or liberty interest triggers procedural due process protection.

102.     Defendants' failure to give Plaintiff a meaningful opportunity to challenge this denial violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

103.     Plaintiff has suffered and continues to suffer injury in the form of unreasonable denial of his adjustment of status and being compelled to leave his job and his home and leave the country due to USCIS error.

### COUNT IV - DECLARATORY JUDGMENT
### VIOLATION OF INA 8 CFR 103.2(b)(16)(i)

104.     Mr. Alhomedey realleges and incorporates the foregoing paragraphs as if fully set forth herein.

105.     8 CFR 103.2(b)(16)(i) requires that "If the decision will be adverse to the applicant or petitioner and is based on derogatory information considered by the Service and of which the applicant or petitioner is unaware, he/she **shall be advised** of this fact and offered an opportunity to rebut the information and present information in his/her own behalf before the decision is rendered, except as provided in paragraphs (b)(16)(ii), (iii), and (iv) of this section. Any explanation, rebuttal, or

information presented by or in behalf of the applicant or petitioner shall be included in the record of proceeding." [emphasis added].

106.    The only ground for denying Plaintiff's application was his purported period of unauthorized work between April 10, 2018 and May 25, 2018.

107.    At the time of the interview, the USCIS Officer did not bring up any issues related to unauthorized work. The USCIS Officer did not issue Plaintiff a Request For Evidence or a Notice of Intent to Deny. This failure deprived Plaintiff of the opportunity to submit evidence proving that he was not working during the aforementioned time period.

108.    Because of this violation, Plaintiff has suffered and continues to suffer injury in the form of unreasonable denial of his adjustment of status and being compelled to leave his job and his home and leave the country due to USCIS error.

## COUNT V -  IMMIGRATION & NATIONALITY ACT AND IMPLEMENTING REGULATIONS

109.    Mr. Alhomedey realleges and incorporates the foregoing paragraphs as if fully set forth herein.

110.    To secure adjustment of status, an applicant must satisfy certain statutorily -enumerated criteria.

111.    By its terms, CARRP creates additional, non-statutory, substantive criteria that must be met prior to a grant of an adjustment application.

112.    Accordingly, CARRP violates several provisions which set forth the exclusive applicable statutory and regulatory criteria for a grant of adjustment.

113.    Because of this violation and because CARRP's additional, non-statutory, substantive criteria have been applied to Plaintiffs.  Plaintiff has suffered and continues to suffer injury in the form

of unreasonable denial of his adjustment of status and being compelled to leave his job and his home and leave the country due to USCIS error.

## COUNT VI - UNIFORM RULE OF ADJUSTMENT

114.     Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

115.     Congress has the sole power to establish criteria for adjustment of status, and any additional requirements, not enacted by Congress, are *ultra vires*.

116.     By its terms, CARRP creates additional, non-statutory, substantive criteria that must be met prior to a grant of an adjustment application.

117.     Accordingly, CARRP violates Article I, Section 8, Clause 4 of the United States Constitution.

118.     Because of this violation and because CARRP's additional, non-statutory, substantive criteria have been applied to Plaintiffs.  Plaintiff has suffered and continue to suffer injury in the form of an unreasonable denial of his application for adjustment.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Plaintiff Abdulaziz Hamad Alhomedey respectfully requests that this Court grant the following relief:

121.     Accept jurisdiction and review of the USCIS decision to deny the application for adjustment of status filed by Plaintiff Abdulaziz Hamad Alhomedey and to revoke Plaintiff's employment authorization;

122.     Declare that Defendants' decision violated the Administrative Procedure Act because it was arbitrary and capricious.

123.    Declare that USCIS's decisions to deny the application for adjustment of status filed by Plaintiff and revoke his employment authorization are unlawful, a violation of the Immigration and Nationality Act and the relevant regulations, and a violation of the United States Constitution;

124.    Order that USCIS shall be enjoined from denying the applications for adjustment of status and revoking the employment authorization of Mr. Alhomedey;

125.    Order USCIS to immediately reinstate Plaintiff's for employment authorization, and order that such employment authorization shall continue to be extended until there is final administrative or judicial decision in his application for adjustment of status;

126.    Order USCIS to approve the application for adjustment of status filed by Plaintiff;

127.    Enter a judgment declaring that (a) CARRP violates the INA and its implementing regulations; the Fifth Amendment to the United States Constitution; and the APA; and (b) Defendants violated the APA by adopting CARRP without promulgating a rule and following the process for notice and comment by the public;

128.    Enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from applying CARRP to the processing and adjudication of Plaintiff's immigration benefit applications;

129.    Order Defendants to rescind CARRP because they failed to follow the process for notice and comment by the public;

130.    Grant attorneys fees and costs pursuant to the Equal Access to Justice Act;

131.    Grant such other relief as may be just and reasonable.

RESPECTFULLY SUBMITTED

this 4th Day of February, 2019

**Hacking Law Practice, LLC**

*/s/ James O. Hacking, III*
James O. Hacking, III - MO Bar # 46728
10900 Manchester Rd., Suite 203
St. Louis, MO 63122
Phone: 314.961.8200
Email: jim@hackinglawpractice.com

ATTORNEYS FOR PLAINTIFFS